Raymond M. Brown, Esq., NJSB#010891974
Janie Byalik, Esq., NJB#040702006
**PASHMAN STEIN WALDER HAYDEN PC**
21 Main Street, Suite 200
Hackensack, NJ 07601
Telephone: (201) 488-8200
Fax: (201) 488-5556

*Counsel for Plaintiff City Newark, New Jersey*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF NEWARK, | |
| Plaintiff, | No. 8:23-cv-02083 |
| v. | |
| HYUNDAI MOTOR COMPANY, HYUNDAI MOTOR AMERICA, KIA CORPORATION, and KIA AMERICA, INC., | AMENDED COMPLAINT |
| | JURY TRIAL DEMANDED |
| Defendants. | |

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................1

II.     JURISDICTION AND VENUE ............................................................3

III.    PARTIES ...............................................................................................8

IV.     FACTUAL ALLEGATIONS................................................................10

        A.      *The necessity of immobilization anti-theft devices or
                other reasonable anti-theft technology.* ...................................10

        B.      *Reasonable anti-theft devices deter vehicle theft.* ...............13

V.      THE SUSCEPTIBLE VEHICLES LACK REASONABLE
        ANTI-THEFT TECHNOLOGY..........................................................14

VI.     DEFENDANTS' VEHICLES HARM NEWARK ...............................16

VII.    DEFENDANTS KNOWLEDGE OF HARM AND
        INSUFFICIENT RESPONSE.............................................................20

VIII.   FIRST CAUSE OF ACTION..............................................................23

        A.      Public Nuisance
                Brought by Newark Against All Defendants ...................................23

IX.     SECOND CAUSE OF ACTION..........................................................27

        A.      Negligence
                Brought by Newark Against All Defendants ...................................27

X.      THIRD CAUSE OF ACTION ..............................................................30

        A.      Fraud...........................................................................................30

XI.     FOURTH CAUSE OF ACTION..........................................................31

        A.      Unjust Enrichment.....................................................................31

XII.    FIFTH CAUSE OF ACTION................................................................33

    A.    Violation of the New Jersey Consumer Fraud Act,
          N.J.S.A. 56:8-1 et seq.
          Brought by Newark Against All Defendants ...................................33

XIII.   SIXTH CAUSE OF ACTION ...............................................................34

    A.    Violation of Newark Municipal Public Nuisance Code,
          NMC 16:15-4
          Brought by Newark Against All Defendants ...................................34

XIV.  PRAYER FOR RELIEF ........................................................................36

XV.   DEMAND FOR JURY TRIAL ...............................................................36

# I.      INTRODUCTION

1.      Plaintiff City of Newark ("Newark" or the "City") is experiencing an epidemic of thefts of vehicles manufactured by Defendants Hyundai Motor Company ("HMC"), Hyundai Motor America (HMA) (collectively "Hyundai"),, Inc., Kia Corporation ("KC"), and Kia America, Inc. ("KA") (collectively, Kia) (together with Hyundai, "Defendants").  These thefts are easily preventable, if only Defendants had installed reasonable anti-theft technology, such as engine immobilizers, in their vehicles.

2.      Instead, Hyundai and Kia designed, manufactured, and sold certain vehicles from 2011 to 2022 that lacked any reasonable anti-theft technology. As a result, those Hyundai and Kia vehicles are susceptible to theft with tools no more advanced than a USB cable. Those Hyundai and Kia vehicles, when manufactured and sold without engine immobilizers or other reasonable anti-theft technology, are referred to hereinafter as the "Susceptible Vehicles."

3.      Since Hyundai and Kia's security failures were exposed in 2021, thefts of those vehicles have soared.  In Newark, 1,178 Hyundais and 723 Kias were reported stolen in the first ten months of 2023—more than a **1000% increase** compared to the City's 2022 theft reports.  Nearly twenty percent (20%) of the City's 3,618 registered Kias and 6,594 Hyundais were reported stolen during 2023.  These thefts account for more than fifty-eight percent (58%) of all vehicles stolen in

1

Newark in 2023.

4.     These vehicle thefts inherently endanger Newark citizens and heavily burden Newark's already-strained resources. Vehicle thefts are associated with reckless driving, reckless conduct, increased violence, and the depletion of scarce emergency resources. They also deprive the community of safe streets and sidewalks.

5.     For just one metric demonstrating how Kia and Hyundai's failures financially burden the City, the Newark Police Division was required to dedicate over 19,284 auto theft suppression overtime hours to address this car theft surge in the first ten months of 2023.   *At minimum*, overtime costs amounted to approximately **$1.1 million** in 2023, which is more than the yearly auto theft suppression overtime costs of 2021 and 2022 combined.

6.     In the face of these harmful impacts, Hyundai and Kia have failed to act and instead have left it to vehicle owners and local law enforcement to address the problem.  Despite its attempt to issue a repair program – the effectiveness of which is questionable – the thefts have continued essentially unabated.

7.     Hyundai and Kia's failure to equip the Susceptible Vehicles with reasonable anti-theft technology, and Defendants' unfair, deceptive, and/or fraudulent business practices caused Newark an ascertainable loss of money and/or property and gives rise to a series of statutory and common law claims. Newark seeks damages and

other relief as outlined herein.

## II.    JURISDICTION AND VENUE

8.      Under 28 U.S.C. § 1332, the Court has subject matter jurisdiction over this dispute because the parties are diverse and the amount in controversy exceeds $75,000. Defendants HMA and KA are citizens of the State of California, where they are headquartered and incorporated. Defendants HMC and KC are both multinational automakers, headquartered in Seoul, South Korea.

9.      This action initially was brought in the United States District Court for the District of New Jersey before it was transferred to this Court as part of multi-district litigation proceedings The District of New Jersey  Court has personal jurisdiction over Defendants because the causes of action alleged in this Complaint arise out of each Defendants' transacting business in New Jersey, contracting to supply services or goods in the state of New Jersey, causing tortious injury by an act or omission in New Jersey, and because Defendants regularly do or solicit business or engage in a persistent course of conduct or deriving substantial revenue from goods used or consumed or services rendered in New Jersey.  Defendants have purposefully directed their actions towards New Jersey and/or have the requisite minimum contacts with New Jersey to satisfy any statutory or constitutional requirements for personal jurisdiction.

10.     This Court has general personal jurisdiction over Defendants HMA and KA because they are incorporated and headquartered in the State of California. HMA and KA have transacted and done business in the State of California and in this judicial district.

11.     As detailed below, this Court has specific jurisdiction over HMC and KC under the long-arm statute of California based on (1) their forum-related activities from which this case arises; (2) the forum-related activities of HMC's primary domestic subsidiary, HMA, which HMC substantially controls; and (3) the forum-related activities of KC's primary domestic subsidiary, KA, which KC substantially controls.

12.     HMC is a South Korea-based company, and its substantial activities directed at the United States give rise to and relate to Plaintiff's claims.

13.     In a recent complaint to enforce its trademark rights, HMC represented that it "currently designs, manufactures, markets, distributes, and sells a wide range of automobile and related automobile parts to over 190 countries throughout the world, including the United States, under the trademark 'Hyundai.'"[1]

14.     HMC and KC design, manufacture, market, distribute, and sell the Susceptible Vehicles under their registered trademarks "Hyundai" and "Kia,"

---

[1] First Amended Complaint at 6, *Hyundai Motor Am., Inc. v. Midwest Indus. Supply Co.*, No. 2:17-cv-3010-JCM-GWF (D. Nev. Nov. 21, 2018), Dkt. No. 34.

4

respectively. Between 2011 and 2022, when the Susceptible Vehicles were sold and distributed in Plaintiff's jurisdiction, HMC and KC purposefully availed themselves of the United States' legal protections by registering and maintaining registrations with the United States government for trademarks associated with their vehicles and parts, which HMC and KC used to identify and distinguish their respective vehicles and parts in the United States, this district, and Plaintiff's jurisdiction.

15.    HMC and KC purposefully availed themselves of markets in the United States, including in this district and Plaintiff's jurisdiction, as each company sells 500 thousand vehicles per year in this market through their respective domestic subsidiaries, HMA and KA.

16.    HMC and KC manufactured over eight million of the Susceptible Vehicles, which were delivered to HMA and KA for sale in the United States. Upon information and belief, HMC and KC manufactured the majority of the Susceptible Vehicles overseas in South Korea. However, HMC and KC segregated the Susceptible Vehicles intended for sale in the United States and shipped those vehicles to the United States with full knowledge and intent that HMA and KA would distribute them across the country.

17.    Rather than passively placing the Susceptible Vehicles into the stream of commerce, HMC and KC intentionally targeted the distribution of the Susceptible Vehicles into United States markets specifically, because engine immobilizers are

5

not expressly required by law to sell the vehicles in this country.

18.     HMC and KC played instrumental roles in HMA's and KA's analysis and decision-making processes related to the design and/or manufacture of the Susceptible Vehicles without reasonable anti-theft technology, such as engine immobilizers.

19.     Upon information and belief, HMC and KC both were involved in monitoring vehicle thefts of the Susceptible Vehicles, as reported by their respective subsidiaries, HMA and KA.

20.     HMC and KC purposely availed themselves of markets in the United States by regularly submitting applications to the Environmental Protection Agency to obtain certification required for the sale of their vehicles in the United States.[2]

21.     HMC and KC exercise control over HMA and KA, respectively, through both formal and informal means.

22.     Upon information and belief, HMC and KC possess the power to

_____

[2] *See, e.g.*, Letter from Hyundai America Technical Center to Director Linc Wehrly re: Request for GHG credit for High Efficiency Alternator Technology (June 10, 2019), https://www.epa.gov/sites/default/files/2019-07/documents/kmc-off-cycle-ghg-credit-high-efficiency-alternator-2019-06-10.pdf (writing on behalf of KC, f/k/a Kia Motors Corporation); *see also* Letter from Hyundai America Technical Center to Director Linc Wehrly re: Request for GHG Off-Cycle Credit for HVAC Brushless Motor Technology in 2020 Model Year and later HMC vehicles (Dec. 15, 2020), https://www.epa.gov/system/files/documents/2022-09/hyundai-ghg-credit-pwm-hvac-blm-apl-2020-12-15.pdf.

appoint board members to HMA and KA, respectively, and both HMC and KC have exercised this power.

23.     HMC operates a "Global Command and Control Center" with "walls covered with television screens and computer monitors" that track "every operating line at 27 plants in the world, in real time, 24 hours a day, 365 days a year."[3]

24.     The production chief for a Hyundai plant in Alabama noted that if there is "a hiccup at any of those boards, headquarters wants to know what needs to be done about it—right now[.]"[4]

25.     Upon information and belief, KC representatives similarly monitor Kia's global operations from HMC's Global Command and Control Center.

26.     Senior executives in South Korea for HMC and KC also regularly visit Hyundai and Kia plants and offices throughout the United States, including HMA's and KA's California headquarters, both of which are located in this district.

27.     The common executives for HMC and HMA frequently overlap. Jose Muñoz, for example, is the current Global Chief Operating Officer of HMC and serves as the President and CEO of HMA. Meanwhile, Brian Latouf serves as the Global Chief Safety Officer for HMC and serves as the Chief Safety Officer of

---

[3] William J. Holstein, *Hyundai's Capabilities Play*, 70 Strategy & Bus. 62, 67–68 (Spring 2013), https://digitaledition.strategy-business.com/publication/?m=6320&i=145911&p=70&ver=html5.
[4] *Id.* at 68.

7

HMA.

28.     KC and KA also share executive employees. SeungKyu (Sean) Yoon serves as President and CEO of KA, as well as Senior Managing Director of KC. Additionally, HMC and KC have overlapping management, with Eui-Sun Chung serving as the President of KC and the Executive Vice Chairman of HMC.

29.     Lastly, HMC and KC control the public name and brand of HMA and KA, respectively.

30.     Venue is proper in both New Jersey and this district pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to the claim occurred in this District. Venue is also proper under 18 U.S.C. § 1965(a) because Defendants reside, are found, have agents, or transact their affairs in this District.

31.     Following the filing of Plaintiff's Complaint, the matter was transferred from the District of New Jersey to this Court for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407.

### III.   PARTIES

32.     Plaintiff City of Newark is a municipal corporation organized under the laws of the State of New Jersey that may sue and plead in its own name. Plaintiff is responsible for the public health, safety, and welfare of its citizens.

33.     Defendant HMC is a multinational automaker headquartered in Seoul, South Korea. HMC, together with Defendants Kia Corporation, Kia America, Inc., and Hyundai Motor America, comprise the Hyundai Motor Group, which designs, manufactures, and distributes the Susceptible Vehicles referenced in this Complaint. HMC is the parent of Hyundai Motor America.

34.     Defendant HMA is a manufacturer and distributor of new motor vehicles under the Hyundai brand; it is incorporated and headquartered in the state of California. HMA distributes, markets, leases, warrants, and oversees regulatory compliance and warranty servicing of Hyundai brand vehicles through a network of over 800 dealers throughout the United States, including Newark, from its headquarters in California.

35.     Defendant KC is a multinational automaker headquartered in Seoul, South Korea. KC is the parent corporation of Kia America, Inc. As of December 31, 2017, Defendant KC's largest shareholder was HMC, which holds 33.88% of KC's stock.[5]

36.     Defendant KA is a manufacturer and distributor of new motor vehicles under the Kia brand; it is incorporated and headquartered in the state of California.

---

[5] *The Future: Kia Motors Annual Report 2017* at 11, Kia, https://worldwide.kia.com/int/company/ir/archive/annual-report/download/B200002757/F200012579 (last visited Apr. 30, 2024).

9

KA distributes, markets, leases, warrants, and oversees regulatory compliance and warranty servicing of Kia-brand vehicles through a network of over 700 dealers throughout the United States, including Newark, from its headquarters in California.

## IV.   FACTUAL ALLEGATIONS

### A.   *The necessity of immobilization anti-theft devices or other reasonable anti-theft technology.*

37.   Since the invention of gasoline powered cars, efforts have been undertaken to prevent vehicles from being stolen. Indeed, in response to automobile thefts around the country, Congress passed the National Motor Vehicle Theft Act, 18 U.S.C.§ 2311 *et seq.*, which made the interstate transportation of stolen vehicles a federal crime.

38.   As time passed and in response to increasing vehicle thefts, in 1966, Congress passed the National Traffic and Motor Vehicle Safety Act (the "Safety Act"), which sought to administer new motor vehicle and traffic safety standards. The Administration of the Safety Act was overseen by the newly created Department of Transportation through its sub-agency: the National Highway Traffic Safety Administration, f/k/a/ the National Traffic Safety Bureau ("NHTSA").

39.   Pursuant to its statutory authority under the Safety Act, NHTSA promulgated federal motor vehicle safety standards ("FMVSS"). Among those

standards, are minimum theft-protection standards for nearly all passenger vehicles in the United States:

> S1. Scope. This standard specifies vehicle performance requirements intended to reduce the incident of crashes resulting from theft and accidental rollaway of motor vehicles.

> S2. Purpose. The purpose of this standard is to decrease the likelihood that a vehicle is stolen, or accidentally set in motion.

> S3. Application. This standard applies to all passenger cars, and to trucks and multipurpose passenger vehicles with GVWR of 4,536 kilograms (10,000 pounds) or less.

> S5.1 Theft Protection.

> S5.1.1 Each vehicle must have a starting system which, whenever the key is removed from the starting system prevents:

> (a) The normal activation of the vehicle's engine or motor; and

> (b) Either steering, or forward self-mobility, of the vehicle, or both.

11

S5.2.2 Except as specified in S5.2.4, the vehicle must be designed such that the transmission or gear selection control cannot move from the "park" position, unless the key is in the starting system.

40.     In response to the increase in stolen cars, which had largely been tied to car thieves who could bypass the ignition lock, NHTSA "decided to require a device, which would prevent either self-mobility or steering even if the ignition lock were bypassed."[6]

41.     An engine immobilizer, for example, is an effective way to satisfy that requirement, because it locks out the engine control module if an attempt is made to start the vehicle without a key or to bypass the electronic ignition system.

42.     An immobilizer is "a standard anti-theft feature" that is present in "[m]ost vehicles made in the last 20 years."[7]

43.     Immobilizer technology functions as an extra security check when an occupant starts a vehicle. It has been described as follows:

---

[6] Federal Motor Vehicle Safety Standards; Theft Protection, 71 Fed. Reg. 17,753 (Apr. 7, 2006), https://www.govinfo.gov/content/pkg/FR-2006-04-07/pdf/06-3358.pdf; *see also* Motor Vehicle Safety Standard No. 114; Theft Protection; Passenger Cars, 33 Fed. Reg. 83, 6,471 (Apr. 27, 1968), https://www.govinfo.gov/content/pkg/FR-1968-04-27/pdf/FR-1968-04-27.pdf.

[7] *What Is an Immobilizer and Does My Car Have One?*, (Dec. 23, 2021), https://www.makeuseof.com/what-is-an-immobilizer-does-my-car-have-one/.

> Transponder chips are found in key fobs and smart keys. When you start the engine or have the key fob inside the automobile, these chips communicate a passcode to the car's immobilizer technology. If the pin code in the key fob meets the one in the immobilizer system, the vehicle will start. Otherwise, your automobile will not start.[8]

44.     Immobilizers have been a common feature in vehicles since the 1990s; indeed, by that time, they had "proliferated" and were "ubiquitous."[9]

45.     Other countries adopted immobilizers and made them mandatory features on vehicles; the EU mandated them in the late 1990s, and other countries followed suit. In those countries, "immobilizers contributed to a significant decrease in auto theft."[10]

**B.     *Reasonable anti-theft devices deter vehicle theft.***

46.     Anti-theft measures, such as engine immobilizers, are standard in most vehicles because they are a critical tool in deterring vehicle thefts, which Defendants have known for years.

47.     In a series of studies, common anti-theft devices, such as electronic

---

[8] *Will an immobilizer    save   your  car   from  being stolen?* (February 10, 2020), https://www.kaspersky.com/blog/36c3-immobilizers/.
[9] *Id.*
[10] *Id.*

13

immobilizers on vehicles "have been found to reduce theft of vehicle rates significantly."[11]   Indeed, it is "the device with the most evidence of effectiveness." *Id.*

48.   According to the Highway Loss Data Institute (HLDI), "vehicle theft losses decreased significantly after factory-installed passive immobilizing antitheft devices were introduced."[12]

49.   A different 2016 study found that the use of immobilizers lowered the overall rate of car thefts by 40% over a ten-year period.[13]

## V.   THE SUSCEPTIBLE VEHICLES LACK REASONABLE ANTI-THEFT TECHNOLOGY

50.   Despite decades of research and reduced vehicle theft and the consequential public safety risks, only a small percentage of Hyundai and Kia models had passive immobilizers or other reasonable anti-theft technology as compared to other manufacturers.

51.   There are two components to NHTSA's vehicle theft regulations—one emphasizing the supply side of the market for stolen vehicles and the other the

---

[11] Morgan et al., *Reducing criminal opportunity: vehicle security and vehicle crime*, Research Report, January 2016, at 87.

[12] *Hyundai and Kia theft losses*, 39 HLDI Bulletin 28 (December 2021), https://www.iihs.org/media/.

[13] Jan C. van Ours & Ben Vollaard, *The Engine Immobilizer: A Non-Starter for Car Thieves*, 126 The Economic Journal 593, 1264, 1283 (June 2016).

14

demand side. The supply-side regulation, 49 C.F.R. § 571.114, requires automobile manufacturers to include reasonable anti-theft technology, such as engine immobilizers for example, to make it harder for would-be thieves to steal cars.

52.     The demand-side regulation, 49 C.F.R. § 541, requires automobile manufacturers to label car parts with unique identifiers to make it easier to identify parts that have been stolen from a vehicle and, thus, reduce the demand for stolen cars and chop shops (where stolen cars are disassembled for valuable parts). If a line of vehicles is adequately protected from theft due to the inclusion of anti-theft technology, manufacturers can apply for exemptions from that labeling requirement. See 49 C.F.R. § 543. Hyundai requested an exemption from the labeling requirement for its 2008 Hyundai Azera line based on its inclusion of an immobilizer.[14] Recognizing the efficacy of the anti-theft technology in March of 2007, "Hyundai stated that the data shows a dramatic reduction of theft rates due to the introduction of devices substantially similar to the Hyundai immobilizer device."

53.     Defendants obviously were aware of the benefits of anti-theft

---

[14] Petition for Exemption From the Vehicle Theft Prevention Standard; Hyundai-Kia America Technical Center, Inc., 72 Fed. Reg. 39,661 (July 19, 2007), https://www.govinfo.gov/content/pkg/FR-2007-07-19/pdf/FR-2007-07-19.pdf; *see also* Petition for Exemption From the Vehicle Theft Prevention Standard; Hyundai-Kia America Technical Center, Inc., 75 Fed. Reg. 1,447 (Jan. 11, 2010), https://www.govinfo.gov/content/pkg/FR-2010-01-11/pdf/2010-236.pdf (granting exemption for 2009 Kia Amanti given Kia's representation that the immobilizer installation for that model should reduce theft rates).

technology as they have installed immobilizers on their vehicles for sale in the Canadian and European markets. Yet, they chose not to install those devices in their American vehicles, with the exception of a few expensive models, which only compounds the harm on low-income communities in Newark.

54.     Thus, the absence of reasonable anti-theft technology, such as immobilizers, inherently makes Defendants' vehicles particularly susceptible to theft.

55.     Defendants knew the benefits of installing effective anti-theft devices in the American market. They acted with full knowledge that they were making choices that would result in their vehicles being more susceptible to theft.

56.     Defendants' decision not to install reasonable anti-theft technology in the Susceptible Vehicles in contrast to the vast majority of car manufacturers that did, has, foreseeably, led to the epidemic plaguing Newark.

## VI.     DEFENDANTS' VEHICLES HARM NEWARK

57.     This phenomenon—the enhanced risk of theft—is playing out in Newark and other communities across the United States.

58.     Like other communities, Newark has seen a dramatic surge in the number of vehicle thefts attributable to the absence of reasonable anti-theft technology.  In all of 2022, of the total 1,994 vehicles stolen in the City of Newark,

163 were Hyundais and 55 were Kias.

59.     In the month of January 2023 alone, there were already over 105 thefts of Kia vehicles reported—nearly double of the entire 2022 total.  Hyundai vehicles have seen a similar increase with over 50 of them reported stolen just in January 2023.

60.     In 2023, 1,178 Hyundais and 723 Kias, a total of 1,901 vehicles, were reported stolen in the City of Newark—more than a 1000% increase compared to the total 2022 theft reports. That amounts to about 20% of the City's 3,618 registered Kias and about 18% of the City's 6,594 Hyundais being stolen this year.

61.     The 2023 thefts substantially dwarf the 2022 thefts and account for more than 58% of vehicles stolen in Newark.  At their current pace, the thefts of Kias and Hyundais in Newark will greatly surpass the number of all vehicles stolen in 2022.

62.     The problem is not isolated to Newark. In 2019, 1,207 Kias and Hyundais were stolen in Missouri.  In 2022, "that number soared to 6,120." In just the latter six months of 2022, the pace of thefts jumped by 288%.[15]  Likewise, in Chicago, Illinois, thefts of Kias and Hyundais surged from about 500 in the first half

---

[15] *Is your car where you left it? Kia and Hyundai thefts in Missouri have skyrocketed*¸ (Feb. 6, 2023), https://www.kcur.org/news/2023-02-06/is-you-car-where-you-left-it-kia-and-hyundai-thefts-in-missouri-have-skyrocketed.

of 2022 to more than 8,350 during the second half of the year and continue to comprise more than half of all vehicles stolen in Chicago in 2023.[16]

63.    Indeed, the theft epidemic has escalated so quickly that major insurance companies will no longer provide new coverage to Hyundai and Kia vehicles that lack the immobilizer technology—a step that was necessary "to protect our policyholders and our business."[17]

64.    The absence of reasonable anti-theft technology and the correlating theft of vehicles designed, manufactured, and distributed by Defendants has morphed into a significant public safety problem for Newark. In fact, in 2023, 74 stolen Kias and Hyundais were used in violent crimes committed in Newark, including shootings and robberies.

65.    In 2023, the Newark Police Division has already dedicated over 19,284 auto theft suppression overtime hours to address this car theft surge, which *at minimum*, overtime costs amounted to approximately $1.1 million in 2023. This is more than the combined auto theft suppression overtime cost of 2021 and 2022, and more than a 1772.77% increase compared to 2020's overtime cost of $58,374.51.

---

[16] Available at https://www.chicago.gov/city/en/depts/mayor/press_room/press_releases/2023/august/SuitAgainstAutomakersKiaAndHyundai.html

[17] *State Farm Says It Has Stopped Insuring Some Kia, Hyundai Vehicles* (Jan. 31, 2023), https://www.cbsnews.com/news/state-farm-progressive-kia-hyundai-auto-insurance/.

By creating, facilitating, and/or otherwise contributing to a rash of car thefts, Defendants are responsible for a substantial risk to public safety.

66.     The federal government also recognizes that "stolen cars constitute a major hazard to life and limb on the highways" because, in part, "cars operated by unauthorized persons are far more likely to cause unreasonable risk of accident, personal injury, and death than those which are driven by authorized individuals."[18]

67.     New Jersey Attorney General Matthew Platkin, along with a bipartisan group of 22 other Attorneys General, sent a letter to Defendants stating:

> Alarmingly high rates of thefts of these vehicles have been sustained over a long period of time. Your consumers continue to be harmed as a result, and worse yet, the thefts contribute to an erosion of public safety as they are frequently accompanied by reckless driving and the commission of other crimes, further endangering our communities.

Letter of 23 State Attorneys General to Hyundai and Kia (March 20, 2023).[19]

68.     Simply put, "[t]hese thefts often result in more than simple property crimes." *Id.*

69.     Getting no response from Defendants, a group of eighteen Attorneys

---

[18] 33 Fed. Reg. 6,471 (April 27, 1968).

[19] Available at https://www.doj.state.wi.us/sites/default/files/news-media/AG%20Letter%20to%20Hyundia%20and%20Kia%20final.pdf.

General renewed the alarm surrounding Defendants' vehicles and asked the National

Highway Traffic Safety Administration to issue a recall of Defendants' vehicles.[20]

70.    Thus, there can be no doubt that a proliferation of vehicle thefts—thefts

made significantly easier because of the defect in Defendants' vehicles—endangers

Newark citizens and threatens the public welfare.

## VII.   DEFENDANTS KNOWLEDGE OF HARM AND INSUFFICIENT RESPONSE

71.    Despite widespread reports of these harms to vehicle owners and

communities across the country, including Newark, Defendants have refused to act.

72.    Defendants were contemporaneously aware of their lack of industry-

standard anti-theft technology and have vowed to include engine immobilizers on

model years 2022 and later.[21]

73.    Similarly, since at least mid-2021, Defendants have known about the

surging number of thefts of their vehicles.[22]

74.    Despite being aware of the preventable harms they were causing,

---

[20] Available at https://portal.ct.gov/-/media/AG/Press_Releases/2023/AG-Multistate-Letter-to-NHTSA- 4202023.pdf.

[21] *Lawsuit claims flaw in Kia and Hyundai vehicles allow them to be stolen with just a USB cord*, (Jul. 28, 2022), https://www.kmbc.com/article/lawsuit-flaw-kia-hyundias-stolen-usb-cord/40747875.

[22] *Hyundai and Kia Refuse St. Louis Mayor's Demand to Install Anti-theft Technology* (Sept. 22, 2022), https://www.ksdk.com/article/news/crime/hyundai-kia-refuse-st-louis-demand-install-anti-theft-technology/.

Defendants have done nothing to meaningfully address the problem.

75.     Defendants initially offered a security kit for vehicle owners for $170 plus cost of installation. But it (a) did not assist owners who have already had their vehicle stolen (nor does it assist Newark, which has already dealt with the ramifications of those thefts), and (b) posed a financial barrier to adoption that guarantees the problem will continue.

76.     Defendants subsequently announced a software upgrade that became available in February 2023, but thefts are largely unabated; "[m]ore than three months later, the automakers are far from putting the problem behind them."[23] As of early May 2023, only 7% of the roughly 8 million eligible vehicles in the United States have received the software upgrade, and even those with the upgrade are still susceptible to break-ins because of the ubiquity of the problem. The news report further noted that "the automakers' decision not to issue a safety recall on the cars— despite pressure from some states—could complicate the effort," and the manufacturers' decision not to issue a recall "means fewer owners would become aware of the free software fix.

77.     Even with fix promised by Hyundai and Kia, nearly five million

_____

[23] Sean McLain, *Kia, Hyundai Thefts Continue Three Months After Carmakers Deployed Fix*, The Wall Street Journal, May 30, 2023; *see Hyundai Charging Customers $170 for a Kit to Protect Its Easy-to-Steal Cars*, (Oct. 1, 2022).

vehicles would still require the upgrade, and thus, are susceptible to theft.[24]

78.     Moreover, the update's efficacy is uncertain. There have been reports of Kia and Hyundai vehicles being stolen after receiving the software update, and Kia and Hyundai have identified scenarios where the software logic fails.[25]

79.     In addition, upon information and belief, the software update does not actually install an immobilizer or other reasonable anti-theft technology; but instead, merely doubles the length of the vehicles' theft alarm sound and adds a new logic check to the vehicles' onboard computers that is intended to prevent the Engine Control Unit from allowing the engine to start and run if the key fob is not used to unlock the doors. The update is likely to inconvenience drivers, making them less likely to seek out and/or use the updated software.

80.     Communities nationwide, including Newark, are suffering harmful effects of the business decisions Hyundai and Kia made not to include reasonable anti-theft technology in the Susceptible Vehicles, thereby creating a public nuisance that continues to this day.

81.     Left with no other choice, Newark initiates this litigation to abate the

---

[24] Automakers Offer Free Fix After Thefts Surge in Wake of Viral Videos (Carfax July 19, 2023), https://www.carfax.com/blog/kia-hyundai-theft-repairs.

[25] Carly Shaffner, *Kia, Hyundai anti-theft software fixes a work in progress*, Auto. News (June 2, 2023, 8:00 AM), https://www.autonews.com/regulation-safety/kia-hyundai-antitheft-software-fix-needs-fixes [https://perma.cc/HGH7-ZHZF]

public nuisance presented by Defendants' vehicles.

## VIII.  FIRST CAUSE OF ACTION

### A.    Public Nuisance

### Brought by Newark Against All Defendants

82.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges:

83.    Pursuant to New Jersey common law, Defendants created, contributed to, and maintained a public nuisance when they intentionally, consciously, knowingly, and purposefully (a) designed, manufactured, marketed, sold, and distributed unsafe vehicles that were statistically more vulnerable to theft without an engine immobilizer or other reasonable anti-theft technology; (b) failed to prevent and/or created, incubated, and maintained the conditions necessary for a secondary market of unsafe and stolen vehicles; and (c) failed to abate either one and pay compensation for the same despite their actual knowledge of the past, continuing, and future harm.

84.    Defendants knowingly and intentionally decided not to use vehicle immobilizers or other reasonable anti-theft technology in the Susceptible Vehicles. Defendants are aware that their conduct has caused an increase in vehicle theft and thus has had, and will continue to have, a detrimental effect on the public welfare,

safety, peace, comfort, and convenience of Newark and its residents.

85.    By creating a rash of car thefts, Defendants are responsible for a substantial risk to public safety.

86.    Reckless driving impacts the comfortable enjoyment of life, health, and safety of others. Recent wave of Hyundai and Kia thefts often involves teenagers joyriding, driving recklessly, and then abandoning stolen vehicles—often after collisions—at various hours of the day and night.

87.    Stolen Kias and Hyundais have been used in violent crimes committed in Newark, such as shootings and robberies.

88.    Police officers responding to vehicle thefts and other crimes stemming from thefts could face serious safety threats.

89.    Car thefts and reckless driving also create a substantial risk of physical harm to pedestrian bystanders.

90.    Defendants' conduct also substantially interferes with the public's right to safe and reasonable access to public thoroughfares. That conduct has contributed to the creation of unlawful obstructions and impediments to the flow of municipal transit vehicles and public traffic in Newark.

91.    Defendants had control over the design and manufacture of the Susceptible Vehicles and their shipping of automobiles to Newark. Defendants continued to maintain control over the conduct through the ability, and failure, to

24

provide the Susceptible Vehicles, initially or retroactively, with reasonable anti-theft technology.

92.     It was reasonably foreseeable that Defendants' actions and omissions would result in the public nuisance and harm to Newark.

93.     Defendants knew or had reason to know of the deterrent effects of reasonably effective anti-theft technology, such as engine immobilizers.

94.     Despite their special position, Defendants intentionally and unreasonably chose not to equip the Susceptible Vehicles with reasonable anti-theft technology. If not for Defendants' intentional and unreasonable conduct, vehicle theft in Newark would not have become so widespread, and the enormous public safety issues that now exist would have been averted.

95.     Defendants knew or had reason to know that their conduct would create a public nuisance. Defendants knew or had reason to know that their conduct was interfering with the public right to public safety and/or that their conduct was substantially certain to result in an increase in vehicle theft that would interfere with public safety.

96.     By failing to install reasonable anti-theft technology in the Susceptible Vehicles, Defendants directly facilitated the rapid increase in vehicle theft and, with it, the public nuisance affecting Newark.

97.     The public nuisance created by Defendants' actions is substantial and

unreasonable. Defendants' actions have caused and continue to cause significant harm to Newark and its community. The gravity of the harm caused far outweighs any utility of the Defendants' conduct.

98.    As a direct and proximate result of Defendants' conduct, Newark has suffered and will continue to suffer economic damages, including significant expenditures for police, emergency, health, prosecutions, corrections, youth rehabilitative services, and other services.

99.    Newark has expended significant time and resources responding to this public nuisance. The police and emergency resources Newark has been forced to divert to respond to these thefts or theft-related crimes leaves fewer resources for combatting other crimes and enhancing community safety.

100.   Newark has suffered, and will continue to suffer, unique harms as described above, which are different in kind and degree to the harms suffered by New Jersey citizens at large. These are harms that can only be suffered by Plaintiff.

101.   Each Defendant's conduct giving rise to the vehicle theft crisis is of a continuing nature and has produced a permanent or long-lasting effect that has a significant effect on the entire community.

102.   Each Defendant acted knowingly, or was substantially certain, that its conduct would result in the public nuisance and significant harm complained of herein.  And, the conduct of each Defendant, either individually or collectively, was

26

a substantial factor in producing and then maintaining the public nuisance complained of herein.

103.   Defendants' conduct damaged, and continues to damage, Newark in an amount to be determined at trial.

104.   Newark seeks monetary and injunctive relief to halt the threat of future harm.

## IX.   SECOND CAUSE OF ACTION

### A.   Negligence

### Brought by Newark Against All Defendants

105.   Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges:

106.   Defendants had a duty to exercise ordinary care and/or reasonable care in the design, research, development, manufacture, testing, and distribution of their vehicles into the stream of commerce, including a duty to exercise care to assure that the vehicles were safe.

107.   Reasonable care includes equipping vehicles with basic, common technology that can deter and prevent threats to public safety.

108.   At all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of failing

to install reasonable anti-theft technology, particularly, leading to the increased risk of vehicle theft and public harm.

109.   Defendants owed and continue to owe Plaintiff a duty not to expose Plaintiff to an unreasonable risk of harm.

110.   Defendants' duties were preexisting.

111.   At all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of forgoing the installation of reasonable anti-theft technology, such as an engine immobilizer technology, in the Susceptible Vehicles and specifically, the increased risk of vehicle theft and resulting public harm.

112.   Defendants knew or reasonably should have known that their vehicles were statistically more vulnerable to theft without reasonable anti-theft technology, the natural and probable consequence would be increased thefts, and that a secondary market would exist, and now does exist, for unsafe and stolen vehicles.

113.   It was also reasonably foreseeable that local governments, like Newark, would bear the cost for dealing with vehicle theft and the effects of a market of unsafe and stolen vehicles.

114.   Defendants knew or, in the exercise of reasonable care, should have known that the omission of reasonable anti-theft technology in the Susceptible Vehicles could cause Plaintiff's injuries and thus created a dangerous and

28

unreasonable risk of injury to Newark. Defendants were therefore in the best position to protect Newark against the foreseeable rise in the theft of the Susceptible Vehicles.

115.   Defendants breached their duty and failed to exercise reasonable care and failed to act as a reasonably prudent person and/or company would act under the same circumstances in the design, research, development, manufacture, testing, and distribution of their vehicles, in that Defendants designed, manufactured, and produced vehicles that fell below the standards for reasonable anti-theft measures.

116.   Defendants were negligent in failing to monitor and guard against third-party misconduct and through their actions and inactions enabled such misconduct.

117.   Defendants acted unreasonably in light of the foreseeable result of their conduct, and Defendants' negligence helped to and did produce, and was a factual and proximate cause, of the injuries, harm, and economic losses that Plaintiff suffered and will continue to suffer.

118.   Defendants' acts and omissions imposed an unreasonable risk of harm to others separately and/or combined with the negligent and/or criminal acts of third parties.

119.   As a proximate result of the Defendants' breach of their duties of care, Defendants damaged and continue to damage Newark in an amount to be determined at trial.

# X.    THIRD CAUSE OF ACTION

## A.    Fraud

### Brought by Newark Against All Defendants

120.   Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges:

121.   Defendants knew or believed that their cars did not have industry-standard anti-theft technology from 2011 to 2022.   Nonetheless, Defendants marketed and sold their vehicles while representing to Plaintiff and its citizens that their cars were safe.

122.   Having been aware that its vehicles lacked the basic industry-standard anti-theft features present in other competing vehicles, Defendants had a duty to disclose that fact in light of the safety concerns that the lack of anti-theft technology presents.

123.   Defendants made incomplete representations about the safety and reliability of its vehicles while purposely withholding material facts about a known safety defect. Defendants failed to disclose the lack of anti-theft technology in their advertising materials or, upon information and belief, at the time of selling the vehicles.

124.   Defendants intentionally suppressed the fact that their cars' anti-theft

30

technology was not comparable to conventional industry standards with the intent to induce an unknowing public, including citizens of Newark, to purchase its cars.

125.   Without disclosing the true facts about their vehicles that inevitably affect the quality, reliability, and safety of those vehicles, the public, including citizens of Newark, reasonably relied on Defendants' misrepresentations and omissions.

126.   As a proximate result of the Defendants' intentional and material omissions and misstatements of fact, Defendants damaged and continue to damage Newark in an amount to be determined at trial.

## XI.   FOURTH CAUSE OF ACTION

### A.   Unjust Enrichment

### Brought by Newark Against All Defendants

127.   Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges:

128.   As an expected and intended result of their conscious wrongdoing as set forth in this Complaint, Defendants have profited and benefited from the cost-savings realized in failing to equip their vehicles with reasonable anti-theft measures.

129.   Unjust enrichment arises not only where an expenditure by one party adds to the property of another, but also where the expenditure saves the other from

expense or loss.

130.   Plaintiff has expended substantial amounts of money in an effort to remedy or mitigate the harms caused by Defendants' conduct, and Plaintiff anticipates those costs will only increase as the problem continues without a solution.

131.   These expenditures include the provision of law enforcement services and other public safety resources to address the theft epidemic.

132.   These expenditures have helped sustain Defendants' businesses, and they have been necessary only because Defendants continue to refuse to act to address the problem.

133.   Plaintiff has conferred a benefit upon Defendants by paying for Defendants' externalities: the cost of the harms caused by Defendants' conduct.

134.   Defendants are aware of these obvious benefits, and their retention of the benefit is unjust.

135.   Defendants have unjustly retained benefits to the detriment of Plaintiff, and Defendants' retention of such benefits violates the fundamental principles of justice, equity, and good conscience.

136.   Defendants' misconduct alleged in this case is ongoing and persistent.

137.   Plaintiff seeks an order compelling Defendants to disgorge all unjust enrichment to Plaintiff.

32

## XII.   FIFTH CAUSE OF ACTION

### A. Violation of the New Jersey

### Consumer Fraud Act, N.J.S.A. 56:8-1 et seq.

### Brought by Newark Against All Defendants

138.   Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges:

139.   The New Jersey Consumer Fraud Act prohibits "[a]ny unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale or advertisement of any merchandise." N.J.S.A. 56:8-1.

140.   Defendants knew that their cars did not have reasonable anti-theft technology from 2011 to 2022. Nonetheless, Defendants represented to Plaintiff and its citizens that their cars were safe.

141.   Defendants intentionally suppressed the fact that their cars' anti-theft technology was not comparable to conventional industry standards or reasonable under the circumstances.

142.   As a proximate result of the Defendants' intentional and material

33

omissions and misstatements of fact, Defendants damaged and continue to damage Newark in an amount to be determined at trial.

143.   Due to Defendant's fraud on its consumers, Plaintiff is entitled to treble damages, costs, and attorney fees.

## XIII.  SIXTH CAUSE OF ACTION

### A.   Violation of Newark Municipal
### Public Nuisance Code, NMC 16:15-4
### Brought by Newark Against All Defendants

144.  Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges:

145.   Newark Municipal Code section 16:15 outlaws, among others in a non-inclusive list, "any matter, thing, condition or act" which (a) "is or may become detrimental or a menace to the health of the inhabitants of this municipality" or (b) "may become an annoyance or interfere with the comfort or general well-being of the inhabitants of this municipality."

146.   Defendants' knowing omission of reasonable anti-theft technology in their cars has created a car theft epidemic in Newark.  Defendants' conduct, both individually and collectively, in designing, manufacturing, selling, distributing, and refusing to fix the vehicles at issue constitutes a public nuisance pursuant to Newark

34

Municipal code 16:15.

147.   In particular, the knowing omission of reasonable anti-theft technology—even after years of notice and requests for abatement—constitutes a hazard to the public health, safety, welfare, and comfort of Newark citizens.

148.   Each Defendant's conduct giving rise to the vehicle theft crisis is of a continuing nature and has produced a permanent or long-lasting effect that has a significant effect on the entire community.

149.   Defendants' interference with the public health, the public safety, the public peace, and the public welfare has resulted in significant harm to Plaintiff.

150.   Defendants acted knowingly, or was substantially certain, that its conduct would result in the public nuisance and significant harm complained of herein. And, the conduct of each Defendant, either individually or collectively, was a substantial factor in producing and then maintaining the public nuisance complained of herein.

151.   Defendant's conduct in causing the public nuisance complained of herein was unreasonable and the gravity of the harm caused far outweighs any utility of the Defendant's conduct.

152.   Moreover, each Defendant's refusal to act to abate the nuisance constitutes continuing unreasonable conduct.

153.   Defendant's conduct damaged, and continues to damage, Newark in an

35

amount to be determined at trial.

## XIV.  PRAYER FOR RELIEF

154.   Newark respectfully requests that this Court enter judgment granting all relief requested in this Complaint, and/or allowed at law or in equity, including:

a. abatement of the nuisance;

b. actual damages;

c. punitive damages;

d. exemplary damages;

e. disgorgement of unjust enrichment;

f. forfeiture, disgorgement, restitution and/or divestiture of proceeds and assets;

g. attorneys' fees;

h. costs and expenses of suit; and

i. pre- and post-judgment interest.

## XV.   DEMAND FOR JURY TRIAL

155.  Plaintiff hereby demands a trial by jury.

RESPECTFULLY SUBMITTED this 3RD DAY OF MAY, 2024.

CITY OF NEWARK

PASHMAN STEIN WADER HAYDEN, PC

By */s/ Kenyatta K. Stewart*
Kenyatta K. Stewart
Corporation Counsel
City of Newark Law Department
920 Broad Street, Room 316
Newark, NJ 07102
Telephone: (973) 733-6560
Fax: (440) 204-2257
stewartk@ci.newark.nj.us

By */s/ Raymond M. Brown*
Raymond M. Brown, NJSB#010891974
(*pro hac vice forthcoming*)
Janie Byalick (*pro hac vice forthcoming*)
Jalen D. Porter (*pro hac vice forthcoming*)
21 Main Street, Suite 200
Hackensack, NJ 07601
Telephone: (201) 488-8200
Fax: (201) 488-5556
rbrown@pashmanstein.com
jbyalick@pashmanstein.com
jporter@pashmanstein.com
*Counsel for Plaintiff City of Newark, NJ*

37